# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BETHESDA HEALTH, INC. d/b/a<br>BETHESDA MEMORIAL HOSPITAL<br>2815 South Seacrest Boulevard<br>Boynton Beach, FL 33435 | ) <br> ) <br> ) <br> ) <br> ) | |
| HALIFAX HEALTH<br>303 N. Clyde Morris Boulevard<br>Daytona Beach, FL 32114 | ) <br> ) <br> ) <br> ) | **COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |
| INDIAN RIVER MEMORIAL HOSPITAL d/b/a<br>INDIAN RIVER MEDICAL CENTER<br>1000 36th Street<br>Vero Beach, FL 32960 | ) <br> ) <br> ) <br> ) <br> ) | |
| LAKELAND REGIONAL MEDICAL CENTER, INC.<br>1324 Lakeland Hills Boulevard<br>Lakeland, FL 33805 | ) <br> ) <br> ) <br> ) | Civil Action No. <u>1:18-cv-875</u> |
| LHP HOSPITAL GROUP LLC<br>2400 Dallas Parkway, Suite 450<br>Plano, TX 75035 | ) <br> ) <br> ) <br> ) | |
| MARTIN HEALTH SYSTEM d/b/a<br>MARTIN MEMORIAL MEDICAL CENTER<br>200 Hospital Avenue<br>Stuart, FL 34995 | ) <br> ) <br> ) <br> ) <br> ) | |
| NAPLES COMMUNITY HOSPITAL, INC.<br>350 7th Street North<br>Naples, FL 34102 | ) <br> ) <br> ) <br> ) | |
| NORTH BREVARD COUNTY HOSPITAL<br>DISTRICT d/b/a PARRISH MEDICAL CENTER<br>951 North Washington Avenue<br>Titusville, FL 32796 | ) <br> ) <br> ) <br> ) <br> ) | |
| SARASOTA MEMORIAL HOSPITAL<br>1700 Tamiami Trail<br>Sarasota, FL 34239 | ) <br> ) <br> ) <br> ) | |

SOUTH BROWARD HOSPITAL DISTRICT )
d/b/a MEMORIAL HOSPITAL MIRAMAR )
3501 Johnston Street )
Hollywood, FL 33021 )
)
SOUTH BROWARD HOSPITAL DISTRICT )
d/b/a MEMORIAL REGIONAL PEMBROKE )
3501 Johnston Street )
Hollywood, FL 33021 )
)
SOUTH BROWARD HOSPITAL DISTRICT )
d/b/a MEMORIAL HOSPITAL WEST )
3501 Johnston Street )
Hollywood, FL 33021 )
)
SOUTH BROWARD HOSPITAL DISTRICT )
d/b/a MEMORIAL REGIONAL HOSPITAL )
3501 Johnston Street )
Hollywood, FL 33021 )
)
THE PUBLIC HEALTH TRUST OF MIAMI-DADE )
COUNTY, FLORIDA d/b/a )
JACKSON MEMORIAL HOSPITAL )
1611 NW 12th Avenue )
Miami, FL 33136 )
)
    Plaintiffs, )
)
   v. )
)
ALEX M. AZAR II, in his official capacity )
as Secretary of Health & Human Services )
United States Department of )
Health & Human Services, )
200 Independence Avenue, S.W. )
Washington, D.C.  20201 )
)
    Defendants. )
_____)

## INTRODUCTION

1.      This case is about the failure of the Secretary of Health & Human Services, acting through the Centers for Medicare & Medicaid Services ("CMS"), to abide by the Special Terms and Conditions of a Medicaid waiver he approved (and reapproved) pursuant to Section 1115(a)(2) of the Social Security Act ("Act").   Under the terms of that waiver and its reauthorization, the Secretary agreed to provide matching federal funds for "medical assistance" furnished to individuals in the State of Florida who received inpatient services as members of the Low Income Pool Medicaid Eligibility Group ("LIP MEG") identified in the Special Terms and Conditions of the waiver.   As a direct, foreseeable, and legal consequence of his approval, the Secretary permitted hospitals in Florida to include the inpatient days attributable to these individuals in calculating their eligibility for increased reimbursements under the Medicare disproportionate share ("DSH") provisions, which provide additional funding for hospitals that serve a disproportionate share of low-income patients.   *See* 42 C.F.R. § 412.106(b)(4)(ii) ("hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under Section 1115 of the Social Security Act.").

2.      Despite authorizing a waiver that identifies these individuals as a "population[] eligible for Title XIX matching funds," the Secretary directed fiscal intermediaries working under his direction to exclude the inpatient days attributable to these individuals from the Plaintiffs' Medicare DSH payment calculations.   This action is inconsistent with statutory provisions governing the provision of benefits under the Act and the plain terms of the Secretary's own long-standing regulation and the waiver he twice approved.   This action constitutes an amendment of a long-standing substantive rule without appropriate notice and comment procedures, and is unsupported by the substantial evidence in the record before the

Secretary's Provider Reimbursement Review Board ("Board"), which rendered the decision at issue.

3.     The Plaintiffs now seek an order from this Court under the Administrative Procedure Act setting aside the Board's decision as contrary to law and arbitrary and capricious, and remanding the matter to the Secretary with instructions to recalculate Plaintiffs' Medicare DSH payments to include patients days attributable to the LIP eligibility group, in accordance with the plain terms of the governing regulations.

## PARTIES

4.     Plaintiffs are hospital organizations in the State of Florida that own and/or operate acute-care hospitals that participate in the Medicare program.

5.     Plaintiff Bay Medical Center Sacred Health System is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0026.

6.     Plaintiff Bethesda Memorial Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0002.

7.     Plaintiff Halifax Medical Center is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0017.

8.     Plaintiff Indian River Memorial Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0105.

9.      Plaintiff Jackson Memorial Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0022.

10.      Plaintiff Lakeland Regional Medical Center is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0157.

11.      Plaintiff Martin Memorial Medical Center is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0044.

12.      Plaintiff Memorial Hospital Miramar is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0285.

13.      Plaintiff Memorial Hospital Pembroke is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0230.

14.      Plaintiff Memorial Hospital West is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0281.

15.      Plaintiff Memorial Regional Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0038.

16.     Plaintiff Naples Community Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0018.

17.     Plaintiff Parrish Medical Center is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0028.

18.     Plaintiff Sarasota Memorial Hospital is a hospital operating in the State of Florida that provides acute-care hospital services and participates in the Medicare program under Provider No. 10-0087.

19.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services, which administers the Medicare program established under title XVIII of the Social Security Act. Defendant Azar is sued in his official capacity only.  The Centers for Medicare & Medicaid Services ("CMS") is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs.  References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## JURISDICTION AND VENUE

20.     This action arises under titles XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

21.     The Court has jurisdiction pursuant to 42 U.S.C. § 1395oo(f)(1).  The Court has authority to issue declaratory and other relief in accordance with 28 U.S.C. §§ 2201(a) and 2202.

22.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1) and also under 28 U.S.C. §§ 1391(b)(2) and (e)(2) because, among other things, defendants, agencies, and

employees of agencies of the United States reside within this judicial district, and a substantial part of the events giving rise to the claims herein occurred within this judicial district.

23.     The Board's decision is final agency action within the meaning of the Administrative Procedure Act.  *See* 5 U.S.C. § 704; 42 C.F.R. §§ 405.1877(a)(2)–(3).  Plaintiffs received notice of the Board's decision on February 12, 2018.  *See* Exhibit A.  This action is timely because it is filed within 60 days of receipt by Plaintiffs of the Board's decision.

## STATEMENT OF FACTS

**A.    Statutory and Regulatory Background: Medicaid and Section 1115 Waivers**

24.     Medicaid is a cooperative federal-state program to assist states in providing medical assistance to eligible low-income individuals under Title XIX of the Social Security Act. The program is jointly funded by federal and state governments, and administered by the states. *See* 42 U.S.C. § 1396 *et seq*.

25.     The federal government funds Medicaid through matching payments to states.  To obtain these matching payments, states must submit a "state plan," to be approved by the Secretary.  42 U.S.C. § 1396b(a).  The state plan "is a comprehensive written statement submitted by the [state] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administrated in conformity with the specific requirements" of federal law.  42 C.F.R. § 430.10.  Federal matching payments are made according to a state-specific formula called the "federal medical assistance percentage."  42 U.S.C. § 1396b(a)(1); 42 C.F.R. § 433.10; *see also* 42 U.S.C. § 1396d(b).

26.     The Medicaid statute authorizes the Secretary to make matching payments for "medical assistance."  Medical assistance is a term of art under the Medicaid statute, and means the "payment of part or all of the cost . . . for [certain categories of] individuals" for a specified

set of services, among which is "inpatient hospital services."  42 U.S.C. § 1396d(a)(i)-(xvii); *see also* 42 U.S.C. § 1396b(a)(1) (providing the Secretary expenditure authority for funds for medical assistance).  The Medicaid statute does not authorize the Secretary to make matching payments for state expenditures that do not constitute "medical assistance."

27.    The Act also gives the Secretary and states flexibility to explore different approaches to providing medical assistance to individuals not otherwise eligible for Medicaid. The Secretary has authority to "waive compliance with any of the requirements" of the Act and allow states to carry out "experimental, pilot, or demonstration project[s]" that are "likely to assist in promoting the objectives" of Medicaid—improving the health outcomes of eligible populations.  42 U.S.C. § 1315(a), (e).  These are known as "section 1115 waivers," and they give states "additional flexibility to design and improve their programs."  *Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs*., 747 F.3d 172, 181 (3d Cir. 2014).  Section 1115 waivers are designed to sweep aside "[r]igid and outdated implementation and interpretation of federal rules and requirements [that] hinder states [from] ensuring Medicaid achieves positive health outcomes."  Letter From the Secretary of HHS and the CMS Administrator to the Nation's Governors at 1 (March 14, 2017), *available at* https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

28.    Persons who are otherwise ineligible for "traditional" Medicaid may be covered under a section 1115 waiver, and states may receive federal matching funds for "medical assistance" provided to these populations.  *See* 42 U.S.C. § 1315(a)(2)(A) (costs "not otherwise . . . included . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan . . .").  However, because the Secretary has no authority under the Medicaid statute to expend matching funds for anything other than "medical assistance," the

Secretary must first determine whether funds expended under a section 1115 waiver would be for "medical assistance" before approving a demonstration project.

**B.      Statutory and Regulatory Background: Medicare DSH**

29.      While Medicare generally pays on a formulaic basis without regard to a provider's actual costs, Congress also recognized that "any hospital that serves a disproportionately large percentage of low-income patients—known as a disproportionate share hospital (DSH)—should be reimbursed at a higher rate, apparently because the more low-income patients a hospital treats, the more it costs on average to care for Medicare patients." *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 177-78 (D.C. Cir. 2008). *See also Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 985 (4th Cir. 1996) ("[L]ow-income Medicare patients have generally poorer health and are costlier to treat than high-income Medicare patients."); 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

30.      Acute-care hospitals serving a disproportionate share of low-income patients are thus eligible for an upward adjustment to standard reimbursement rates for inpatient treatment, called a "DSH adjustment" or "DSH payment." *See* 42 U.S.C. § 1395ww(d)(5)(F); *see also* 42 C.F.R. § 412.106.

31.      To calculate which hospitals serve a disproportionate number of low-income patients and thus are eligible for a DSH adjustment, CMS adds together two separate fractions, based on inpatient days, to arrive at a hospital's "disproportionate patient percentage." 42 U.S.C. 1395ww(d)(5)(F)(i)(I); (d)(5)(F)(v); 42 C.F.R. § 412.106(c)(l). The first fraction—called the SSI or Medicare fraction—is based on the inpatient days of individuals who are eligible for Supplemental Security Income ("SSI") and entitled to benefits under Medicare Part A. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The second fraction—called the Medicaid fraction—is based

on the number of Medicaid patients that the provider serves.  "The Medicare and Medicaid fractions represent two distinct and separate measures of low income—SSI (*i.e.*, welfare) and Medicaid, respectively—that when summed together, provide a proxy for the total low-income patient percentage." *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 916 (D.C. Cir. 2013).

32.    This Complaint involves the Medicaid fraction. The numerator of the Medicaid fraction is "the total number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible for medical assistance* under a State plan approved under Subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  The denominator is the "total number of the hospital's patient days for such period." *Id*.  In other words, "the more a hospital treats patients who" are eligible for Medicaid (and thus count in the numerator), "the more money it receives for each patient covered by Medicare." *Adena Reg'l Med Ctr*., 527 F.3d at 178 (emphasis omitted).

33.    But the Medicare statute also grants the Secretary authority to allow hospitals to count in the numerator "patient days of patients not [eligible for medical assistance under an approved State plan] but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI"—*i.e.*, under a section 1115 waiver.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  "In plain English, the Medicare DSH formula takes into account the number of patient days for those patients eligible for Medicaid, and may also include patient days for those patients ineligible for Medicaid, but who received benefits under a Medicaid 'demonstration project."' *Nazareth Hosp*., 747 F.3d at 175.

34.    This was not always so; prior to 2000, the Secretary's regulations were "silent as to whether hospitals could include § 1115 expansion-waiver patient days in their DSH

calculations." *Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 45 (D.D.C. 2016). In considering the issue, the Secretary reasoned that "allowing hospitals to include the section 1115 expanded waiver population in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low-income individuals covered by Medicaid." 65 Fed. Reg. 3136, 3137 (Jan. 20, 2000).

35. To this end, the Secretary issued a regulation deeming a patient "eligible for Medicaid" (and thus counted in the Medicaid fraction numerator) if "the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver." 42 C.F.R. § 412.106(b)(4)(i). For purposes of § 412.106(b)(4)(i), hospitals are permitted to count all days that are "attributable to populations eligible for Title XIX matching payments" through a section 1115 waiver. *Id.* § 412.106(b)(4)(ii).

36. The plain language of the Secretary's regulation thus establishes three key elements for counting waiver patient days in the numerator of the Medicaid fraction: (1) the waiver must be approved by the Secretary; (2) waiver expenditures must be eligible for federal matching payments, which can only be true if those expenditures are for "medical assistance"; and (3) the waiver must cover inpatient hospital services.

37. Congress ratified the Secretary's decision to include waiver days in the Medicaid fraction numerator through the Deficit Reduction Act of 2005 ("DRA"), Section 5002, P.L. 109-171, 120 Stat. 4 (Feb. 8, 2006).

C.     **Florida's Waiver Project and the Low-Income Pool**

38.     In 2006, the Florida legislature authorized and the Secretary approved a section 1115 waiver that reformed Florida's Medicaid program.  *See* Fla. Stat. § 409.91211 (2006).  The waiver program ran for an initial five-year period, from July l, 2006 until June 30, 2011, and was renewed for another three years for December 16, 2011 through June 30, 2014.  CMS approved and renewed the waiver "after complex and lengthy negotiations" with the State to define its scope and terms.  72 Fed. Reg. 29,748, 29,814 (May 29, 2007).

39.     A fundamental pillar of Florida's waiver project is a "low-income pool," which covers health care services, including inpatient services provided to a new Medicaid eligibility group.  As stated in the Special Terms and Conditions of the waiver that were approved by CMS, the purpose of the LIP was "to ensure continued government support for the provision of health care services to Medicaid, underinsured and uninsured populations" in the State, and providers eligible for LIP payments were required to sign agreements confirming that purpose.  2006 Special Terms and Condition ("STC") 91.  *See also* 2011 STC § II ("The Demonstration . . . established a Low Income Pool (LIP) to ensure continued support for the provision of health care services to Medicaid, underinsured and uninsured populations.").  The LIP provides direct payment and distributions to safety-net providers in Florida "for the purpose of providing coverage to the uninsured through provider access systems."  2006 STC § II.  These eligible patients are a discrete and defined group:  uninsured and underinsured beneficiaries, as well as traditional Medicaid beneficiaries who have exhausted their Medicaid benefits.

40.     Under the terms of the section 1115 waiver approved by the Secretary, each of the hospitals in the provider access system agreed to provide inpatient services to the uninsured and underinsured as a condition of receiving LIP payments, which are defined by the approved

waiver as being payments for "medical assistance" to the LIP eligibility group.  When a LIP patient visits one of these providers, the hospital ultimately determines whether that person is uninsured or underinsured and whose care is therefore eligible for coverage through the LIP.

41.    CMS policed the waiver and the LIP program in particular to ensure that the State was providing services to a specifically identifiable population.  CMS required the State to submit quarterly and annual reports to CMS detailing waiver status generally, "Low Income Pool activities and associated expenditures," and other data elements.  CMS also required that State officials participate in monthly calls discussing the waiver developments, including care delivery, access, and financial reporting related to budget neutrality issues.

42.    Payments from the LIP enabled provider hospitals to expand comprehensive services to the uninsured and underinsured through new initiatives such as emergency room diversion and primary care programs.  The receipt of LIP funding has permitted hospitals serving vulnerable populations in the State to expand the number of primary care centers that they operate, expand the operating hours of existing primary care centers, and add specialized inpatient services such bone marrow transplant programs, adult and pediatric heart transplant programs, and other services that would not otherwise be available but for the funds received for care provided to the LIP eligibility group.

43.    The Special Terms and Conditions approved by CMS specify that "[f]unds from the LIP may be used for health care expenditures (medical care costs or premiums) that would be within the definition of medical assistance in Section 1905(a) of the Act."  2006 STC 94; 2011 STC 54.  *See also* Letter from CMS Director of Family and Children's Health Programs to Florida Agency for Health Care Administration ("CMS Approval Letter") at 1 ("Funds from the

LIP may be used for health care expenditures that would be within the definition of medical assistance [in] section 1905(a) of the Social Security Act.").

**D.      Administrative Proceedings**

44.      Plaintiffs are hospitals in Florida that entered into agreements with the State and received LIP payments as "provider access systems" in each of the fiscal years under appeal. Plaintiffs received these LIP payments for providing medical assistance in the form of inpatient care to specific and identifiable uninsured and underinsured individuals in the fiscal years in question.

45.      Plaintiffs' year-end Medicare payment determinations, issued by fiscal intermediaries working under the Secretary's direction, excluded the LIP waiver days from their DSH payment calculations, as reflected in their respective Notice of Program Reimbursement documents.

46.      Each of the Plaintiffs timely appealed this final determination to the Board, a component of CMS.  The Plaintiffs filed group appeals as follows:

| PRRB Case No. | PRRB Case Name |
|---|---|
| 09-0580GC[1] | Memorial Hospital West 2007/2008 DSH LIP CIRP Group |
| 13-3376G | King & Spalding 2007 Low-Income Pool Sec. 1115 DSH Waiver Days Group |
| 14-0645G | King & Spalding 2008 Low-Income Pool Sec. 1115 DSH Waiver Days Group |
| 14-0871GC | Memorial Healthcare System 2009 Acute DSH LIP Days CIRP Group |
| 14-3832GC | Memorial Healthcare System 2011 Low Income Pool DSH Waiver Days Group |
| 15-0446G[2] | King & Spalding 2009-2011 Low Income Pool Sec. 1115 DSH Waiver Days |

[1] The Board included with its Decision a listing of the hospitals in each group.  For PRRB Case No. 09-0580GC, it omitted the second page of the list of hospitals, omitting three providers: Memorial Hospital West (FYE 4/30/2008), Memorial Hospital Miramar (FYE 4/30/2007) and Memorial Hospital Miramar (FYE 4/30/2008).

[2] For PRRB Case No. 15-0446G, the Board's listing omits two providers:  Bethesda Memorial Hospital (FYE 9/30/2009) and Bethesda Memorial Hospital (FYE 9/302010).   The Board previously added these providers to PRRB Case No. 15-0446G in jurisdictional decisions related to PRRB Case Nos. 14-1813G and 14-3341G.

| | Group |
|---|---|
| 15-3474GC | Memorial Healthcare System 2013 DSH Low Income Pool 1115 Waiver Days CIRP Group |

47.     On October 3-4, 2016, the Board conducted a live hearing on all of Plaintiffs' group appeals identified in the preceding paragraph. Plaintiffs put on significant testimony from State officials as to the history and execution of the Florida waiver program generally and the LIP specifically.  A provider representative also testified as to how such inpatient days are captured and reported to the State for the purpose of providing medical assistance under the LIP program, and reported for Medicare DSH payment.

48.     On February 8, 2018, the Board issued a decision on the merits of Plaintiffs' group appeals in favor of the Secretary.  *See* PRRB Decision No. 2018-D21 ("Board Decision"). This decision was received by Plaintiffs' on February 12, 2018.

49.     The Board determined that the Medicare fiscal intermediaries "properly excluded Florida's Low-Income Pool § 1115 Waiver days from the numerator of the Medicaid fraction when calculating the Providers' DSH payments."  Board Decision at 10.  *See also id.* at 8 ("[I]t is clear that the Secretary intended to limit the inclusion of patient days in the DSH calculation to *individuals* who become eligible under the terms of the waiver, or who receive specific medical services provided under the waiver.  It is not intended to include payments made to a hospital to compensate it for services provided to an unspecified population . . .") (emphasis original); *id.* (The waiver does not adequately describe the exact nature of what is being paid for and whether it would be an 'approved expenditure under Title XIX.'").  Central to the Board's decision that the LIP eligibility group is not "eligible for inpatient services" is the fact that the LIP does not exhibit attributes of the "traditional" Medicaid program, including enrollment cards, defined coverages and exclusions, and internal rules regarding claims processing and appeals.  *See id.* at

9-10 (affirming the exclusion of LIP patient days because LIP beneficiaries are not "eligible to enroll," including by being "required to apply," "receiv[ing] a Medicaid card, a certificate of coverage, hav[ing] a right of reconsideration on appeal, [or] receiv[ing] a bill or notification when a claim is paid").

50.     On February 27, 2018, pursuant to 42 C.F.R. § 405.1875(a) and (b), Plaintiffs petitioned the Administrator of CMS to review and set aside the Board's decision.  *See* Request for Administrator Review of Board Determinations in Various Group Cases (Feb. 27, 2018). The Administrator declined to set aside the Board's decision on April 6, 2018.  Board Decision No. 2018-D21 now constitutes the final decision of the Secretary, and Plaintiffs now seek review of that decision pursuant to 42 U.S.C. § 1395oo(f).

## FIRST CAUSE OF ACTION

### The Board's Decision Is Contrary to Statutory Authority And Not In Accord With Governing Law

51.     The allegations set forth in paragraphs 1 through 50 are incorporated by reference as if fully set forth herein.

52.     The Court must set aside final agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations."   5 U.S.C. §§ 706(2)(A), 706(2)(C).

53.     Here, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) allows for "patient days of patients not [eligible for medical assistance under a State plan] but who are regarded as such because they receive benefits under a demonstration project approved under title XI of this chapter" to be included in the calculation of the Medicaid fraction "to the extent and for the period the Secretary determines appropriate."

54.     Through the LIP program, patients "receive benefits" under any permissible construction of the meaning of the words.  Patients receive a benefit of coverage for health care services for which they would otherwise be obligated.

55.     Further, the Secretary has determined, though a rulemaking, that these patients days are appropriately counted in the Medicaid fraction numerator if "the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver."   42 C.F.R. § 412.106(b)(4)(i).

56.     The Board's decision runs contrary to statute insofar as it concluded that the LIP program does not provide benefits to individual patients.  The Medicaid statute authorizes the Secretary to make federal matching payments to States only for expenditures for "medical assistance" under the state plan.  *See* 42 U.S.C. § 1396b(a)(1).  A state's expenditures under a waiver project are "regarded as expenditures under the State plan," *i.e.*, those expenditures are regarded as "medical assistance."  *See* 42 U.S.C. §1315(a)(2)(A).  And, by statutory definition, medical assistance "means payment of part or all of the cost of . . . care and services . . . for individuals." 42 U.S.C. § 1396d(a).

57.     Because the Secretary has made federal matching payments for the LIP program, the LIP program is necessarily providing "medical assistance" "for individuals" under the terms of the Act.  By concluding, despite this statutory language, that the LIP program provides benefits to an "amorphous population" instead of individuals, the Board's decision is contrary to statutory language and not in accordance with governing law.

58.     The Board's decision is also contrary to law because it writes into the statute a requirement that the provision of benefits under a waiver resemble the provision of benefits under "traditional" Medicaid, as measured by indicia such as enrollment cards, statements of coverage, and the like—none of which is found in the statutory language. *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear."); *see also Jordan v. Sec'y of Educ.*, 194 F.3d 169, 171–72 (D.C. Cir. 1999) (agency's decision to "add an obligation that is not in the statute . . . changed the nature of the statute"; the "Secretary may not rewrite the statute").

59.     Because the Board's decision writes additional requirements into the statute and is inconsistent with statutory provisions that govern the provision of benefits under the Social Security Act, it is contrary to statutory right or authority and not in accordance with governing law, and must be set aside.

## SECOND CAUSE OF ACTION

**The Board's Decision Is At Odds With The Plain Language of the Secretary's Regulations Because LIP Beneficiaries Are "Eligible for Inpatient Hospital Services" Under an Approved Waiver**

60.     The allegations set forth in paragraphs 1 through 50 are incorporated by reference as if fully set forth herein.

61.     This Court is required by law to overturn an agency action that is "in excess of statutory jurisdiction [or] authority" or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2).

62.      "It is axiomatic . . . that an agency is bound by its own regulations."  *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation

marks omitted).  Agency action is arbitrary and capricious when the agency's determination is inconsistent with its own regulations.  *See Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 231 (D.C. Cir. 2013).    Deference to an agency's interpretation is inappropriate when the interpretation is "'plainly erroneous or inconsistent with the regulation.'"  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).

63.    The Board's determination that LIP beneficiaries are not "eligible for inpatient hospital services" is at odds with plain regulatory language, deserves no deference, and must be set aside as arbitrary and capricious.

64.    Under the Secretary's regulations, a patient is "eligible for Medicaid" and thus her patient days are counted in the Medicaid fraction numerator if "the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver."    42 C.F.R. § 412.106(b)(4)(i).  For purposes of § 412.106(b)(4)(i), hospitals are permitted to count all days that are "attributable to populations eligible for Title XIX matching payments" through a waiver approved under § 1115.  *Id*. § 412.106(b)(4)(ii).

65.    Under established Medicaid and Medicare case law, "eligibility" simply means fitness, qualification, or meeting a set of requirements that demonstrates capacity to receive some benefit.  *See, e.g*., *Jewish Hospital, Inc. v. Secretary of Health & Human Services*, 19 F.3d 270, 274 (6th Cir. 1994) ("eligible for medical assistance" means being "capable of receiving federal medical assistance or Medicaid").  *See also Univ. of Washington Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1034 (9th Cir. 2011) ("[A] person is 'eligible for medical assistance' if he or she is

'capable of receiving' medical assistance"). To be "eligible for inpatient hospital services" under a waiver, therefore, is simply to meet the qualifications required to receive inpatient hospital services pursuant to the terms of the waiver.

66.     LIP patients were "eligible for inpatient hospital services" within the meaning of 42 C.F.R. § 412.106(b)(4)(i).  As a threshold matter, the waiver specifically defines LIP patients as an "eligibility group," 2006 STC 108(b); 2011 STC 76, whose care is considered "medical assistance," 2006 STC 94; 2011 STC 54.  Consistent with those terms, each of the Plaintiffs entered into agreements with the State under the terms of the LIP to provide inpatient services to the uninsured and underinsured as a condition for receiving payments from the LIP.  Not only were the patients "eligible" for inpatient services, they actually received such services in order for the Providers to make a claim for payment under the LIP program and Medicare DSH methodology.  The LIP program was described under the CMS-approved section 1115 waiver as providing "medical assistance" to beneficiaries.  The LIP patient is therefore "capable" of receiving "medical assistance" in the form of inpatient services that are covered by the LIP fund, and is thus "eligible" for inpatient services under the plain language of the Secretary's regulations.

67.     Finally, LIP beneficiaries meet the requirements of § 412.106(b)(4)(ii) because their patient days are "attributable to populations eligible for Title XIX matching payments" through a waiver approved under section 1115.  The Special Terms and Conditions make clear that the State shall receive "F[ederal] F[inancial] P[articipation] for Medicaid *and LIP payments to hospitals*" in amounts not to exceed the cost of furnishing services to eligible individuals. 2006 STC 97; 2011 STC 57 (emphasis added).  *See also* 2006 STC 111 ("CMS will provide FFP for medical assistance payments with dates of service and during the operation of the 1115

waiver."). CMS's approval letter, moreover, clarifies that federal matching funds are available for LIP expenditures; it states that "[t]he availability of Federal matching funds for the LIP is contingent upon the State meeting all LIP Milestones." CMS Approval Letter at 1. And CMS expressly relied on section 1115 when declaring that expenditures made by the State of Florida for health care services provided to the low-income pool population are eligible for federal matching payments. CMS Waiver and Expenditure Authorities at 3; *see also* 72 Fed. Reg. at 29,814 ("approved expenditures [under the Florida waiver] will be eligible for Medicaid matching consistent with the authority under section 1 l 15(a)(2) of the Act").

68.    The Florida waiver program that created the LIP thus meets all of the requirements for counting waiver patient days in the numerator of the Medicaid fraction found in the Secretary's regulation: (1) the waiver was approved by the Secretary; (2) waiver expenditures are eligible for federal matching payments because those expenditures are for "medical assistance"; and (3) the waiver covers inpatient hospital services. The Board's decision to the contrary violates the plain language of the Secretary's own regulations and are arbitrary and capricious under the APA.

**THIRD CAUSE OF ACTION**

**The Board's Decision Is At Odds With The Plain Language of the Secretary's Regulations Because LIP Beneficiaries Receive "Medical Assistance"**

69.    The allegations set forth in paragraphs 1 through 50 are incorporated by reference as if fully set forth herein.

70.    Independently, the Board's decision is arbitrary and capricious because payments for inpatient services provided pursuant to the waiver are made for "medical assistance," which makes LIP beneficiaries "eligible for inpatient hospital services" within the meaning of the Secretary's regulation.

71.    The Special Terms and Conditions of the waiver specify that "[f]unds from the LIP may be used for health care expenditures (medical care costs or premiums) that would be within the definition of medical assistance in Section 1905(a) of the Act."  2006 STC 94; 2011 STC 54.  *See also* CMS Approval Letter at 1 ("Funds from the LIP may be used for health care expenditures that would be within the definition of medical assistance [in] section 1905(a) of the Social Security Act.").  The term "medical assistance," is a term of art under the Medicaid statute, and means the "payment of part or all of the cost . . . for [certain categories of] *individuals*" for a specified set of services, among which is "inpatient hospital services."  42 U.S.C. § 1396d(a) (emphasis added).  Therefore, CMS's acknowledgment that LIP funds constituted "medical assistance" is an acknowledgment that these funds were to be used to provide "a specified set of services," including "inpatient hospital services" to "individuals." This explicit agreement by CMS that LIP beneficiaries receive "medical assistance" means that, as a simple definitional matter, LIP patients are "eligible for inpatient hospital services" within the meaning of the Secretary's regulations.

72.    Michele Golden, a former Florida Medicaid official, testified at hearing that CMS intended the LIP program to be "a very detailed, direct, money-follows-the-person-type program."  Hearing Transcript Day 1, 81-82.

73.    This acknowledgement by CMS that LIP beneficiaries receive "medical assistance" is in flat contradiction to the Board's assertion that it "cannot determine whether the benefit [of the LIP] to the patient was similar to those available to traditional Medicaid beneficiaries, limited or otherwise."  Board Decision at 10.  The language of the waiver—which the Board ignores altogether—confirms that LIP funds may only be used for "medical care costs" that are "within the definition of medical assistance."  2006 STC 94; 2011 STC 54.

74.     Moreover, the plain terms of the State's waiver belie the Board's assertion that the LIP "provides a gross payment to hospitals . . . to reimburse them for services provided to uninsured and underinsured individuals as an undifferentiated group, not identified or qualified individually for waiver services," which the Board cites as justification for excluding LIP patient days from the Medicaid fraction numerator.  Board Decision at 8.  Again, by statutory definition, the term "medical assistance" means the "payment of part or all of the cost . . . for [certain categories of] individuals" for a specified set of services, among which is "inpatient hospital services."  42 U.S.C. § 1396d(a).  Therefore, CMS's acknowledgment that LIP funds constituted "medical assistance" is an acknowledgment that these funds were to be used to provide "a specified set of services," including "inpatient hospital services," to "individuals."  CMS's approval of Special Terms and Conditions acknowledging that LIP beneficiaries receive medical assistance establishes beyond all doubt that LIP payments are "for individuals."

75.     If CMS objected to characterizing LIP beneficiaries as Medicaid eligibles receiving medical assistance, it could have rejected any waiver proposal that included such language.  But the agency did the opposite: it approved and renewed the waiver with the LIP fully intact "after complex and lengthy negotiations."  72 Fed. Reg. at 29,814.  CMS could hardly have been unaware of the import of its agreement that LIP payments constituted "medical assistance"—*i.e.*, that the patient days of LIP beneficiaries would count in the Medicaid fraction numerator.

76.     Deference to an agency's interpretation of its regulations is not warranted when this interpretation results in "unfair surprise" to regulated parties.  *Christopher v. SmithKline Beecham Cor*p., 132 S. Ct. 2156, 2159 (2012).  CMS's after-the-fact attempt to elude the plain language of its own regulations and the waiver it agreed to—*twice*—results in unfair surprise to

Plaintiffs, is arbitrary and capricious because it is plainly inconsistent with the Secretary's regulations, and must be set aside.

## FOURTH CAUSE OF ACTION

### The Board's Decision Announced a New Substantive Rule Without Complying With Procedures Required By Law

77.     The allegations set forth in paragraphs 1 through 50 are incorporated by reference as if fully set forth herein.

78.     The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes . . . practices bearing on any of the foregoing." 5 U.S.C. § 551(4). Rulemaking is the "agency process for formulating, amending, or repealing a rule." *Id*. at § 551(5). The APA proscribes agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see also id.* § 706(2)(A).

79.     If an agency gives a rule a sufficiently definite interpretation, and then later fundamentally modifies that interpretation, the agency must follow the procedures set forth in Section 553 of the APA and can only modify the rule through notice and comment procedures.

80.     The Medicare statute grants the Secretary authority to allow hospitals to count "patient days of patients not [eligible for medical assistance under an approved State plan] but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). It is undisputed that the LIP eligibility group is part of a "demonstration project approved under subchapter XI."

81.     Exercising this discretion, the Secretary issued a regulation in 2000 stating that patient days would count in the Medicaid fraction numerator if "the patient is eligible for

inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver." 42 C.F.R. § 412.106(b)(4)(i). The singular requirement of this regulation is that the patient be "eligible for inpatient services." Nothing in this longstanding interpretation, or in CMS practice, imposed a requirement that a beneficiary under a waiver be "eligible to enroll" in a program that resembled a traditional Medicaid program in order to count those patient days. Indeed, the very purpose of permitting states to seek section 1115 waivers is to design Medicaid programs that expand coverage without conforming to all requirements and characteristics of traditional Medicaid. This constitutes the long-standing initial interpretation of the Secretary's regulation.

82.     However, in the Board decision below, the Board determined that for patient days to count, "benefits" can only be provided in the context of a program with traditional attributes of enrollment and claims determination, in which beneficiaries enroll, are issued identifying cards, and are subject to internal program rules that provide for claims, appeals, notices, etc. *See* Board Decision at 9-10 (affirming the exclusion of LIP patient days because LIP beneficiaries are not "eligible to enroll," including by being "required to apply," "receiv[ing] a Medicaid card, a certificate of coverage, hav[ing] a right of reconsideration on appeal, [or] receiv[ing] a bill or notification when a claim is paid").

83.     This new interpretation fundamentally modified the Secretary's prior long-standing interpretation of his own regulation, which plainly permits the counting of patient days paid "under a waiver authorized under section 1115(a)(2) of the Act on that day," and imposed new and post-hoc substantive burdens on Plaintiffs in order to obtain a DSH adjustment.

84.    This new interpretation is also plainly at odds with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) and other provisions of the Act, which contains no explicit requirement, or even an indication, that a patient must "receive benefits" in a manner that replicates traditional Medicaid in order for his patient days pursuant to a demonstration project to count in the numerator of the Medicaid fraction.

85.    The entire purpose of the LIP eligibility group, as stated in the CMS-approved Special Terms and Conditions, was "to ensure continued government support for the provision of health care services to Medicaid, *underinsured and uninsured populations*."  2006 STC 91; 2011 STC § II.  Under the LIP, beneficiaries are provided access to health services that are then paid for by a third party, obviating any need for patients to bear that cost themselves.  These "direct payments and distributions to safety-net providers" are made for the express purpose of "providing *coverage to the uninsured* through provider access systems," 2006 STC § II (emphasis added), which is a benefit to LIP participants.

86.    The Board also determined that the waiver "does not adequately describe the exact nature of what is being paid for and whether it would be an 'approved expenditure under Title XIX.'"  Board Decision at 8.  But there is no requirement of an "adequate" description of services under the statute or the Secretary's regulation; this requirement is created from whole cloth without justification or explanation.  Moreover, it is belied by CMS's own document describing its expenditure authority, which states that the LIP program "shall . . . be regarded as expenditures under the State's Title XIX plan."

87.    Finally, there is nothing in section 1115 that requires a demonstration project to exhibit a particular administrative structure in order for patient days to count in the numerator, so

long as the waiver serves the objectives of Medicaid and meets the requirements of 42 C.F.R.
§ 412.106(b)(4).

88.    The Secretary's new interpretation of his regulations, as an amendment to a
established substantive rule, was subject to the notice and comment requirements for amending a
rule under the APA.

89.    The Secretary's failure to comply with notice and comments requirements before
modifying the substantive rule is a violation of the APA and the Board's decision must therefore
be set aside.

**FIFTH CAUSE OF ACTION**

**The Board's Decision Is Unsupported By Substantial Evidence**

90.    The allegations set forth in paragraphs 1 through 50 are incorporated by reference
as if fully set forth herein.

91.    The APA permits judicial review of agency actions, findings, and conclusions that
are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(E).

92.    Although the Board stated that it could not make its determination with "any
certainty" (and therefore disallowed the associated days), the proper standard for Board
determinations is a preponderance of the evidence.  42 C.F.R. § 405.1871(a)(3).

93.    At the hearing and throughout briefing, Plaintiffs offered substantial, largely
unrebutted evidence that:

      a.  CMS was substantially involved in reviewing and approving how providers
         reported days associated with the LIP program to Florida;

b. LIP patients are "capable" of receiving "medical assistance" in the form of inpatient services that are covered by the LIP fund, and thus are "eligible" for inpatient services;

c. LIP beneficiaries were identified individually for waiver services, and that program managers were required to match LIP payments to eligible individuals who received covered services, contrary to the Board's statement that the LIP merely "provides a gross payment to hospitals . . . to reimburse them for services provided to uninsured and underinsured individuals as an undifferentiated group, not identified or qualified individually for waiver services," Board Decision at 8;

d. Hospitals receiving LIP payments used those funds to expand services to the target populations and make new health services available, rather than simply being reimbursed for services that beneficiaries would have received anyway, contrary to the Board's insinuation that individuals in the LIP eligibility group received no benefit because their care would have been provided regardless of the waiver, *see* Board Decision at 9;

e. LIP expenditures are eligible for federal matching payments under Title XIX; and

f. The LIP promotes the objectives of Medicaid.

94.     Had the Board credited this evidence, it would have been compelled to include LIP patient days in the Medicaid fraction numerator. Instead, it upheld the Secretary's decision to exclude these inpatient days, based on irrelevant factual statements that are inconsistent with the substantial evidence that was before the Board.

95.    As such, the Board's decision runs counter to the substantial evidence in the record and violate the APA.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request an Order:

a.    Declaring that LIP beneficiaries are "eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2) of the Act," within the meaning of 42 C.F.R. § 412.106(b)(4)(i);

b.    Vacating PRRB Decision No. 2018-D21 because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

c.    Requiring the Secretary to recalculate Plaintiffs' Medicare DSH calculations to include the section 1115 waiver LIP days;

d.    Requiring the Secretary to pay the Plaintiffs the additional sums due them including interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

e.    Requiring the Secretary to pay legal fees and costs of suit incurred by the Plaintiffs; and

f.    Providing such other just and proper relief as the Court may consider appropriate.

Respectfully submitted,

/s/ *Mark D. Polston*
Mark D. Polston (Bar No. 431233)
Justin A. Torres (Bar No. 1003136)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006
202.626.5540 (phone)
202.626.3737 (fax)
MPolston@kslaw.com

Date:  April 13, 2018