# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **BETHESDA HEALTH, INC., *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 18-875 (RMC)** |
| | ) | |
| **ALEX M. AZAR II, Secretary of the Department of Health and Human Services,** | ) ) ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## OPINION

This case concerns the application of a mathematical intersection between the federal Medicare program and the joint state/federal Medicaid program insofar as inpatient hospital care is reimbursed by Medicare. Hospitals that treat significant numbers of low-income patients receive a higher amount per Medicare patient as a "disproportionate share hospital (DSH) adjustment." The size of the DSH adjustment to a given hospital is determined in part by the percentage of the hospital's total patient days attributed to *Medicaid*-eligible patients; the more patients a hospital treats who are "eligible for Medicaid," the greater its DSH adjustment and the greater its reimbursement rate under *Medicare*. The phrase "eligible for Medicaid" thus plays an important role in determining the amount of federal funding a hospital receives, and much ink has been spilled over its meaning in various contexts. This case is one such example.

Plaintiffs are a group of hospital organizations[1] in the State of Florida which provide uncompensated inpatient hospital services to uninsured and underinsured patients. These patients would not typically be "eligible for Medicaid." However, in 2006 Florida authorized, and the Secretary of the Department of Health and Human Services (HHS) approved, a Medicaid "demonstration project" which reformed Florida's Medicaid program and established, *inter alia*, a federally-matched $1 billion Low Income Pool (LIP). Funds from the LIP were used to reimburse hospitals for the uncompensated inpatient hospital services provided to uninsured and underinsured patients.

The Medicare statute and its regulations allow patients to be "deemed eligible for Medicaid"—even if they are not—and counted towards a hospital's DSH adjustment if those patients are "eligible for inpatient hospital services" under a Medicaid demonstration project. The question here is whether the uninsured and underinsured patients whose uncompensated inpatient hospital services were reimbursed by the LIP, with the Secretary's blessing, so qualify. The Secretary has already answered "no." Plaintiffs challenge this answer as arbitrary and capricious. Both Parties move for summary judgment.

The Court concludes that the uninsured and underinsured patients whose uncompensated inpatient hospital services were reimbursed by the LIP as part of a demonstration project were "eligible for Medicaid" within the meaning of the statute and regulation and should have had their patient days included in the relevant DSH calculations. Accordingly, the Court

---

[1] Specifically, Plaintiffs are Bethesda Health, Inc.; Halifax Health; Indian River Memorial Hospital; Lakeland Regional Medical Center, Inc.; LHP Hospital Group LLC; Martine Health System; Naples Community Hospital; North Brevard County Hospital District; Sarasota Memorial Hospital; and South Broward Hospital District, each doing business as various hospitals.

will grant Plaintiffs' motion for summary judgment and deny the government's cross-motion. The matter will be remanded for further proceedings.

## I. BACKGROUND

### A. The Medicaid Statute and Medicaid Demonstration Projects

Although this is a Medicare case, a brief introduction to Medicaid is necessary for context. Medicaid was adopted in Title XIX of the Social Security Act (the Act), 42 U.S.C. § 1396 *et seq.* It is a joint federal-state program which "offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 541 (2012). To receive federal funding under Medicaid, a state must submit a plan for medical assistance for approval to the Centers for Medicare and Medicaid Services (CMS), the agency within HHS which administers both Medicaid and Medicare. This so-called State plan specifies who will receive medical care and what care they will receive, among other details of the State plan's administration. Once a State plan is approved, CMS provides federal funds to the state matching, to varying degrees, the amount the state itself "expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1). The more "medical assistance" hospitals provide to Medicaid patients under a State plan, the more payments the state makes to those hospitals, and the more CMS reimburses the state.

Generally, under a traditional State plan, CMS only matches state expenditures for "medical assistance," a term limited by statute to certain enumerated services provided to certain enumerated classes of individuals. *See* 42 U.S.C. § 1396d(a) (defining "medical assistance"). Title XI § 1115(a) of the Social Security Act, 42 U.S.C. § 1315(a), however, authorizes the Secretary to waive some of Medicaid's statutory requirements for experimental state "demonstration projects" which, in the Secretary's judgment, will "assist in promoting the

objectives of [Medicaid]." *Id.* These demonstration projects—also known as § 1115 waivers—"enable the states to try new or different approaches to the efficient and cost-effective delivery of health services, or to adapt their programs to the special needs of particular areas or groups of recipients," 42 C.F.R. § 430.25, and a state's costs towards a demonstration project "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan." 42 U.S.C. § 1315(a)(2)(A). In plain English, the law allows a state to adopt a demonstration project, with prior approval from the Secretary, to "provide benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures." *Forrest Gen. Hosp. v. Azar*, No. 18-60227, 2019 WL 2417409, at *2 (5th Cir. June 10, 2019). Patients not normally eligible for Medicaid who nonetheless receive Medicaid benefits under a demonstration project are known as "expansion waiver populations." *See Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 846 (D.C. Cir. 2008).

### B. The Medicare Statute and the Disproportionate Share Hospital Adjustment

Medicare, adopted as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a federal program which provides health insurance to those who qualify, mostly senior persons receiving Social Security Income benefits at retirement or those receiving Social Security Disability Income due to a covered disability. It is a huge program, paid for by taxes. *See Azar v. Allina*, 139 S. Ct. 1804, 1808 (2019). Part A of Medicare reimburses hospitals for the costs of inpatient medical care to such patients. Critically, Medicare no longer reimburses hospitals for their *actual* operating costs. Described most simply, CMS reimburses hospitals "at a fixed amount per patient" for each day of inpatient hospital services provided, according to a patient's diagnosis. *Billings Clinic v. Azar*, 901 F.3d 301, 303 (D.C. Cir. 2018). That fixed amount per patient day differs among hospitals and is adjusted annually upwards or downwards

4

based on various local factors. As relevant here, Congress has determined that "[h]ospitals that serve a disproportionate share of low-income patients have higher [M]edicare costs per case," H.R. Rep. No. 99-241, pt. 1, at 16 (1985), and those hospitals receive an upward adjustment to their Medicare reimbursement, which is known as the disproportionate share hospital (DSH) adjustment.[2]

To determine whether a hospital serves a disproportionate share of low-income patients, CMS looks to its "disproportionate patient percentage," which is calculated by adding together two fractions known as the Medicare fraction and the Medicaid fraction. Together these two fractions "provide a proxy for the total low-income patient percentage."[3] *Catholic Health Initiative Iowa Corp. v. Sebelius*, 718 F.3d 914, 916 (D.C. Cir. 2013). This case involves only the Medicaid fraction,

> the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX [*i.e.*, Medicaid], but who were not entitled to benefits under part A of this subchapter [*i.e.*, Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Put simply, for the purposes of this case, hospitals must count how many in-hospital days were spent treating "patients who . . . were eligible for medical assistance under a State plan approved under [Medicaid]." The effect of this fraction is that "the more a hospital treats patients who are eligible for medical assistance under . . . *Medicaid*, the

---

[2] The underlying concern is that low-income patients are less likely to receive regular health care and therefore present upon admission to a hospital with greater needs than those with more financial assets. *See* H.R. Rep. No. 99-241, pt. 1, at 16.

[3] Medicaid patients are a helpful proxy for the number of low-income patients a hospital serves because the program is geared towards low-income patients who do not qualify for Medicare due to work history, age, or similar situations.

more money it receives for each patient covered by *Medicare*." *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 178 (D.C. Cir. 2008) (internal marks omitted) (emphasis in original).

That said, the meaning of the phrase "patients who . . . were eligible for medical assistance under a State plan approved under [Medicaid]" is not as obvious as it may sound. This is because there is a second part to the definition of the Medicaid fraction:

> In determining under [the Medicaid fraction] the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], the Secretary may, to the extent and for the period the Secretary deems appropriate, include patient days of patients *not so eligible but who are regarded as such because they receive benefits under a demonstration project* approved under subchapter XI.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). This means that hospitals may count "both (1) days a hospital treated patients who were Medicaid-eligible, and (2) days a hospital treated patients who are *regarded as Medicaid-eligible* because they received demonstration project benefits." *Forrest Gen. Hosp.*, 2019 WL 2417409, at *2 (emphasis added). Interestingly, although the Medicare DSH provisions have existed since 1986, Congress only recently added this second part of the Medicaid fraction statute, as § 5002(a) of the Deficit Reduction Act of 2005, Pub. L. No. 109-71, § 5002(a), 120 Stat. 4, 31 (Feb. 8, 2006). To understand this development, we turn to the regulations implementing the Medicaid fraction.

### C. The Medicare DSH Regulation

The regulation implementing the Medicaid fraction of the DSH calculation is found at 42 C.F.R. § 412.106(b)(4) and includes in the Medicaid fraction "the number of the hospital's patient days of service for which patients were *eligible for Medicaid*." 42 C.F.R. § 412.106(b)(4) (emphasis added). Initially, patient days attributable to expansion waiver populations could not be included in a hospital's DSH calculation because CMS only considered

6

patients "eligible for Medicaid" if they were "eligible for medical assistance under an approved Medicaid state plan." 42 C.F.R. § 412.106(b)(4)(i) (1999). Demonstration projects, approved under Title XI, are not part of State plans approved under Title XIX. *See Cookeville*, 531 F.3d at 848. This language was not applied evenly across the states, however, *see id.* at 846, so in January 2000 the Secretary promulgated an Interim Final Rule allowing *all* patient days attributable to expansion waiver populations to be included in the DSH adjustment calculation:

> For the purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

65 Fed. Reg. 3,136, 3,137 (Jan. 20, 2000) (codified at 42 C.F.R. § 412.106(b)(4)(ii)) (2000 Interim Final Rule); *see also id.* at 3,136 ("[W]e believe allowing hospitals to include the section 1115 expanded waiver population in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid.").

But while the 2000 Interim Final Rule resolved one problem, it introduced another: Some Medicaid demonstration projects provided only limited benefits to expansion waiver populations, such as family planning and prescription drugs benefits. While such demonstration projects were permissible and approved, the expansion waiver populations which received such limited benefits tended to have higher incomes than traditional Medicaid beneficiaries and including them in the DSH calculation essentially skewed the low-income proxy. *See* 68 Fed. Reg. 45,346, 45,420-21 (Aug. 1, 2003) (2003 Clarifying Rule). In August 2003, the Secretary thus clarified that his "intention in allowing hospitals to include patient days related to section 1115 expansion waiver populations was to include patient days of demonstration populations who receive benefits under the demonstration project that are similar

to traditional Medicaid beneficiaries, *including inpatient benefits*," *id*. (emphasis added), and amended the implementing regulation to state:

> a patient is *deemed eligible for Medicaid* on a given day only if the patient is *eligible for inpatient hospital services* under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day . . . .

*Id.* at 45,470 (emphasis added) (codified at 42 C.F.R. § 412.106(b)(4)(i)).

Congress approved this understanding of the DSH adjustment statute because in addition to amending the statutory definition of the Medicaid fraction, as discussed above, the Deficit Reduction Act also expressly ratified the 2000 Interim Final Rule and 2003 Clarifying Rule. *See* Deficit Reduction Act § 5002(b). As a result, hospitals may now include in their DSH calculations patient days attributable to patients "eligible for inpatient hospital services" under a demonstration project. 42 C.F.R. § 412.106(b)(4)(i).

### D. Florida's Demonstration Project

The Secretary approved a five-year demonstration project for Florida's Medicaid program in 2006, pursuant to certain Special Terms and Conditions (STC).[4] *See generally* STC at AR398-433. The demonstration project had several components, but as described in the STC, one fundamental element was the creation of a Low Income Pool (LIP), a federally-matched $1 billion dollar capped annual allotment which was established "to ensure continued government support for the provision of health care services to Medicaid, underinsured and uninsured populations." STC ¶ 91 at AR421.

Hospitals generally provide health care services to uninsured and underinsured patients in the form of uncompensated care—also known as charity care—which is

---

[4] This demonstration project was renewed for another three-year term in 2011. *See* Renewal of Expenditure Authority for Florida's Medicaid Reform Section 1115 Demonstration at AR943.

unreimbursed, generally because a patient has insufficient third-party health insurance, if any at all, and cannot afford to pay the cost themselves.  Without government support, the cost of uncompensated care is borne entirely by the hospital, limiting how much care it can afford to provide to the uninsured and underinsured.  The LIP "continued government support" because LIP funds could be used "for health care expenditures . . . that would be within the definition of medical assistance in [42 U.S.C. § 1936d(a)]," that were incurred by hospitals "for uncompensated medical care costs of medical services for the uninsured."  STC ¶ 94 at AR422.  The use of LIP funds was implemented according to a Reimbursement and Funding Methodology (RFM) document negotiated between Florida and CMS and approved by the latter.  *See* STC ¶ 101 at AR423-24; *see generally* RFM at AR449-71.

As discussed earlier, under traditional Medicaid, the federal government matches a state's reimbursements to its hospitals pursuant to the State plan so that more medical assistance to Medicaid patients costs more to that state and to CMS in reimbursements.  The LIP portion of Florida's demonstration project functioned similarly, but with a caveat:  The LIP was a *capped* allotment, which meant that each year Florida could receive no more than $1 billion in matching federal funds to the LIP to reimburse hospitals for providing uncompensated care to uninsured and underinsured patients not otherwise covered by Medicaid.  While $1 billion is a large amount of money, Florida is also a large state, and the allotment was consistently "insufficient to fund a statewide benefit for the uninsured."  RFM at AR449.  Accordingly, Florida "adopted a basic distribution methodology similar to CMS' methodology of providing a predetermined pool to fund the uninsured, underinsured, and Medicaid shortfalls."  RFM at AR450.  In this way, Florida developed a formula by which hospitals could claim a share of the limited LIP funds to reimburse them for specified expenditures for underinsured and uninsured

patients under the demonstration project, but no share would reimburse "100% of the cost of services for the uninsured [and] underinsured." RFM at AR451.

Participating hospitals entered into agreements with the state to use LIP funds "to increase the provision of health services for the Medicaid, uninsured, and underinsured people of . . . Florida." *See, e.g.*, Letter of Agreement at AR2550. So that Florida could calculate each hospital's shares of LIP funding, hospitals were required to submit to the state "Milestone Reports" which summarized the "unduplicated count of Medicaid and uninsured/underinsured visits at their respective facilities funded by LIP resources." RFM at AR468. Hospitals were further required "to document the number of services provided to those individuals," distinguishing between inpatient and outpatient hospital services provided. RFM at AR468; *see, e.g.*, Low Income Pool Milestone Reporting Requirements at AR1083; *see also* Transcript of PRRB Hearing at AR279 (Michele Golden) ("[P]roviders . . . must maintain medical records and track . . . the individuals they're providing services to using the low-income pool funding, and at any time, they may be requested to provide supporting documents or an onsite visit to verify those.").

One result of this funding methodology was that although Florida hospitals provided and documented inpatient care to individual patients, and although that inpatient care was factored into their LIP reimbursements, the hospitals received lump sums from the LIP that were not earmarked for any particular individual but, rather, partially reimbursed the hospitals' costs for *all* qualifying inpatient hospital services provided to *all* uninsured and underinsured patients.

In each of the first three years following implementation of the LIP, hospitals reimbursed by the LIP were estimated to have provided approximately 1.5 million days of

inpatient hospital services to underinsured and uninsured patients, up from roughly 1 million days in the year prior to implementation. *See* University of Florida, Evaluation of the Low-Income Pool Program Using Milestone Data: SFY 2008-09 (University of Florida Study) at AR1814, AR1841, AR1856.

### E. Procedural History

Per standard procedure, Plaintiffs each requested Medicare reimbursements by filing annual cost reports with a fiscal intermediary[5] (essentially, private contractors who process and audit Medicare reimbursements for CMS). *See Banner Health v. Sebelius*, 715 F. Supp. 2d 142, 146 (D.D.C. 2010). Plaintiffs included inpatient days attributable to underinsured and uninsured LIP patients in their submissions. The fiscal intermediary excluded those days.

Plaintiffs each timely appealed to the Provider Reimbursement Review Board (Board), a five-person independent panel within CMS which, as its name suggests, reviews reimbursement decisions made by fiscal intermediaries. Analyzing the applicable regulation, the Board upheld the fiscal intermediary's consolidated decisions for three reasons. First it explained that, based on the preamble to, and the language of, the 2000 Interim Final Rule, "the Secretary intended to limit the inclusion of patient days in the DSH calculation to *individuals* who become eligible under the terms of the waiver, or who receive specific medical services under the waiver," and that the DSH adjustment "is not intended to include payments made to a hospital to compensate it for services provided to an unspecified population." Board Decision at AR25 (emphasis in original). Put another way, the Board considered it impermissible for the LIP to issue to hospitals bulk reimbursements for uncompensated care to uninsured and

---

[5] Fiscal intermediaries are now officially called Medicare Administrative Contractors, or MACs. However, as the regulation, the Parties' briefs, and much of the relevant case law still refers to fiscal intermediaries, the Court will continue to use that term here.

underinsured patients in lieu of payments on behalf of specific patients who were identified with each reimbursement.

Second, the Board found that the waiver did not "adequately describe the exact nature of what [was] being paid for and whether it would be an 'approved expenditure under Title XIX.'" *Id.* For comparison, the Board identified a demonstration project in Massachusetts which "established eligibility criteria" and "provided a clearly established benefit—premium subsidy to enroll in a managed care plan which provided the same benefits as provided to traditional Medicaid-eligible individuals." *Id.* at AR26 (citing *Sw. Consulting UMass Mem'l Health Care & Steward Health 2009 DSH CCHIP Section 1115 Waiver Days Grps. v. Nat'l Gov't Servs., Inc.*, No. 2017-D4, 2017 WL 909303 (P.R.R.B. Jan. 27, 2017), *rev'd* 2017 WL 2403398 (CMS Adm'r Rev. Mar. 21, 2017), *vacated and remanded sub nom. HealthAlliance Hosps., Inc. v. Azar*, 346 F. Supp. 3d 43 (D.D.C. 2018)).[6] The Board also identified a demonstration project in Mississippi by which hospitals were reimbursed for uncompensated care provided to inpatients displaced by Hurricane Katrina, because "the State of Louisiana made expedited determinations of eligibility for specific individuals and . . . hospitals made claims specific to these individuals." *Id.* (citing *CCT&B 2005-2006 Hurricane Katrina § 1115 Waiver UCP Days Grp. v. Novitas Solutions, Inc.*, No. 2016-D18, 2016 WL 6299482 (P.R.R.B. Sep. 16, 2016), *rev'd* 2016 WL 7744987 (CMS Adm'r Rev. Nov. 18, 2016), *aff'd sub nom. Forrest Gen. Hosp. v. Hargan*, No. 2:17-CV-8 (S.D. Miss. Feb. 22, 2018), *rev'd and remanded Forrest Gen. Hosp.*, 2019 WL 2417409).[7] In Plaintiffs' case, the Board concluded that the lack of established

___

[6] The Board's decision was reversed by the CMS Administrator whose decision, in turn, was vacated by the district court. The court decision in *HealthAlliance* is discussed in Part III, *infra*.

[7] *Forrest General Hospital* also has a complicated procedural history. The Board's decision was reversed by the CMS Administrator, whose decision was sustained by the district court but then reversed by the Fifth Circuit. The Circuit's analysis is discussed in Part III, *infra*.

eligibility criteria in the § 1115 waiver documents themselves meant that there was no "defined group of eligible . . . Section 1115 waiver individuals" and that "it is not the individual patients whose eligibility is established and benefits paid on their behalf." *Id.* at AR27.

Finally, the Board reasoned that for "patient days to be included in the DSH calculation, these days must be for 'populations who receive benefits under the demonstration project that are similar to those available to traditional Medicaid beneficiaries.'" *Id.* (quoting 68 Fed. Reg. 27,154, 27,207 (May 19, 2003)). The Board then concluded that patient days attributable to expansion waiver populations whose inpatient care was reimbursed by the LIP could not be included in the DSH calculation because the terms of the demonstration project did not specify what benefits such populations were to receive. *Id.*

Plaintiffs requested review by the CMS Administrator. Review was denied, rendering the Board's opinion the relevant final agency action. Plaintiffs now challenge the Board's decision as arbitrary and capricious under the Administrative Procedure Act (APA). The matter is ripe for review.[8]

## II.  LEGAL STANDARD

Summary judgment is the proper stage for determining whether, as a matter of law, final agency action is supported by the administrative record and is consistent with the APA. *See* Fed. R. Civ. P. 56; *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977). The law provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is

---

[8] *See* Pls.' Mot. for Summ. J. (Pls.' Mot.) [Dkt. 18]; Pls.' Mem. in Supp. of Their Mot. for Summ. J. (Pls.' Mem.) [Dkt. 18]; Def.'s Mot. for Summ. J. [Dkt. 19]; Mem. of P. & A. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ. J. (Def.'s Opp'n) [Dkt. 20]; Pls.' Reply and Resp. to Def.'s Cross-Mot. for Summ. J. (Pls.' Reply) [Dkt. 21]; Reply in Supp. of Def.'s Mot. for Summ. J. (Def.'s Reply) [Dkt. 24].

"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). That said, arbitrary and capricious review is "narrow." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A court is not to "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Courts may set aside as arbitrary and capricious agency action which contradicts that agency's own regulations. *See Erie Boulevard Hydropower, LP v. Fed. Energy Regulatory Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017). However, deference is due to an agency's interpretation of its own otherwise ambiguous regulation, unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Deference to an agency's interpretation of its own ambiguous regulation is particularly called for when the regulation concerns a highly technical or complex area, such as Medicare, and the agency has unique expertise. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

A court's review is normally limited to the administrative record, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 160 (D.C. Cir. 2003), and the party challenging an agency's action bears the burden of proof, *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002).

## III.    ANALYSIS

At the risk of repeating the procedural history of this case, it is helpful to state at the outset specifically what agency action this Court is reviewing. As described above, the Secretary has promulgated a regulation, codified at 42 C.F.R. § 412.106(b)(4), that instructs fiscal intermediaries as to which patient days shall be included in the Medicaid fraction of the Medicare DSH adjustment. The fiscal intermediary, applying that regulation, determined that patient days attributable to underinsured and uninsured patients who received inpatient hospital

services, but which services were reimbursed *en gros* by the Florida LIP, should be excluded

from Plaintiffs' Medicaid fraction. Plaintiffs appealed that determination to the Board, which

interpreted the Secretary's intent animating said regulations and affirmed the fiscal

intermediary's decisions. At bottom, then, the question for this Court is whether the Board and

the fiscal intermediary correctly interpreted and applied 42 C.F.R. § 412.106(b)(4).

This same question has recently been addressed by two different courts. In

*HealthAlliance Hospitals, Inc. v. Azar*, 346 F. Supp. 3d 43, Judge Ketanji Jackson of this District

Court considered the same regulation in an almost identical case and reversed the CMS

Administrator based on the plain language of the regulation. In that case, the Commonwealth of

Massachusetts had applied for, and the Secretary had approved, a demonstration project known

as Commonwealth Care, which allowed Massachusetts to subsidize private health insurance for

many individuals who were not otherwise eligible for insurance under Medicare or Medicaid. *Id.*

at 50. Neither Massachusetts' application nor the Secretary's waiver identified any particular

benefit or type of coverage that was mandated. *Id.* at 51. As a matter of fact, however,

Commonwealth Care required all subsidized insurance plans to cover the same inpatient hospital

services for their subscribers that were extended to Medicaid patients. *Id.* Nonetheless, because

of this omission from the § 1115 waiver documents themselves, the CMS Administrator reversed

the Board and found that Commonwealth Care patients were not "eligible" for such inpatient

hospital services under the demonstration project. *Id.* at 53. The CMS Administrator thus

disapproved inclusion of the waiver expansion population's patient days in the DSH calculation.

*Id.*

On review, Judge Jackson held that the CMS Administrator's decision was

arbitrary and capricious, explaining that the "*plain language* of the applicable regulation

*unambiguously* requires that all patient days attributable to individuals receiving health insurance through Medicaid or through a roughly equivalent authorized demonstration project (as evidenced by the provision of 'inpatient hospital services') must be counted in the Medicaid fraction's numerator." *Id.* at 56 (emphasis added). Judge Jackson further explained that the language of the waiver was irrelevant to the fiscal intermediary's calculation because the regulation at § 412.106(b)(4) does not define, discuss, or otherwise cross-reference those portions of the Code of Federal Regulations addressing the requirements for a demonstration project, and as such there was no reason for the fiscal intermediary to look beyond the plain language of § 412.106(b)(4). *See id* at 58. Thus, "the only . . . question from the standpoint of the fiscal intermediary who is charged with counting the patient days associated with an approved demonstration project under section 412.106(b)(4) . . . is whether patients covered by Commonwealth Care were capable of receiving inpatient health services through the insurance plans this program financed," which the court determined in the affirmative. *Id.* at 60.

In *Forrest General Hospital v. Azar*, 2019 WL 2417409, the Fifth Circuit also considered the same regulation and statute. Plaintiffs there were Mississippi hospitals which provided inpatient hospital services to Hurricane Katrina evacuees under a demonstration project that permitted Mississippi "to reimburse providers that incurred uncompensated care costs for medically necessary services . . . for Katrina evacuees and affected individuals who did not have coverage under . . . Medicaid, . . . private insurance, or under State-funding health insurance programs for a five-month period—the uncompensated care pool (UCCP)." *Id.* at *4. Notwithstanding, when Mississippi hospitals sought reimbursement under Medicare, the CMS Administrator reversed the Board and disallowed UCCP patient days from their DSH calculations. As in this case, the CMS Administrator analogized all uncompensated care to state-

only charity care and found that uninsured patients were not "eligible for medical assistance under a State plan approved under [Medicaid]," despite the approved waiver. *Id.*

The Fifth Circuit found the Secretary's decision there also arbitrary and capricious, holding that the unambiguous "statute means that patients who aren't *actually* Medicaid-eligible still count towards the Medicaid fraction's numerator if they're considered or accounted to be capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority." *Id.* at *7; *see* also *id.* at *11 ("The law governing the inclusion of § 1115 waiver patient days in the Medicaid fraction is straightforward: The plain regulatory text demands that such days be included—period."). As a result, the Fifth Circuit concluded that even though UCCP patients were uninsured or underinsured and otherwise Medicaid-ineligible, they nonetheless "were capable of receiving inpatient health services" as uncompensated care "under a § 1115 demonstration" that was clearly authorized by the Secretary and so should have been included in the DSH calculation. *See id.* at *11.

### A. 42 C.F.R. § 412.106(b)(4)

#### 1. Interpreting the Regulation

To recap, the DSH implementing regulation for the Medicaid fraction states:

(4) Second computation. The fiscal intermediary determines . . . the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to [Medicare], and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

> (ii) . . . [F]or purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for [Medicaid] matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4). As did the courts in *HealthAlliance* and *Forrest General Hospital*, this Court finds that the regulation is clear and unambiguous, and that the government's interpretation warrants no deference.

"The regulation describes the pool of qualifying hospital patient days." *Forrest General*, 2019 WL 2417409, at *8. Clearly, a fiscal intermediary is required to include all "days of service for which patients were eligible for Medicaid" in the DSH calculation. 42 C.F.R. § 412.106(b)(4). The regulation further states that a patient is "*deemed eligible for Medicaid . . . if the patient is eligible* for inpatient hospital services under an approved State Medicaid plan *or* under a waiver authorized under section 1115(a)(2)." *Id.* § 412.106(b)(4)(i) (emphasis added). Thus, this provision equates, for the purposes of the DSH calculation, patient days for otherwise Medicaid-*ineligible* patients with patient days for Medicaid-eligible patients if such ineligible patients receive inpatient hospital services under a demonstration project "authorized under section 1115(a)(2)." *Id.* Section 412.106(b)(4)(i) accomplishes this equivalency by using the same "eligible for Medicaid" terminology found in § 412.106(b)(4) and by connecting Medicaid-eligible patients to demonstration projects patients with the word "or." *Id.* "On a given day" also directs the fiscal intermediary to look at the patient's *actual* eligibility for inpatient hospital services directly under Medicaid *or* under a § 1115 waiver demonstration project authorized by the Secretary. *HealthAlliance*, 346 F. Supp. 3d at 57. "What does *not* matter for purposes of this regulation is what the plan documents say about eligibility for particular services." *Forrest Gen. Hosp.*, 2019 WL 2417409, at *8 (emphasis in original).

Moreover, the key words of subsection (i) are plain to understand. "Eligible" is no term of art and is generally construed to mean "capable of receiving." *See Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 274 (6th Cir. 1994); *Covenant Health Sys. v. Sebelius*, 820 F. Supp. 2d 4, 12 (D.D.C. 2011); *cf. Eligible*, Black's Law Dictionary 634 (11th ed. 2019) ("Fit and proper to be selected or to receive a benefit."). "Under" also has no special meaning and is best read in context to mean "subject or pursuant to" or "by reason of the authority of." *HealthAlliance*, 346 F. Supp. 3d at 57-58. Taken together, then, "the phrase 'eligible for inpatient hospital services . . . under a waiver authorized under section 1115(a)(2)' is plainly understood as describing those individuals who were *capable* of receiving inpatient hospital services pursuant to the project that the Secretary approved in the section 1115(a)(2) waiver." *HealthAlliance*, 346 F. Supp. 3d at 58 (emphasis in original).

The words of subsection (ii) are similarly clear. "Eligible" and "under" share the same meaning, and "through" in this context means "because of" or "on account of." *Through*, Oxford English Dictionary, https://www.oed.com/view/Entry/201386. Thus, "populations eligible for [Medicaid] matching payments through a waiver approved under section 1115" are populations capable of receiving Medicaid matching payments on account of a waiver approved pursuant to section 1115.

### 2. Applying the Regulation

The record in this case could not state any more clearly that the Secretary intended to designate uninsured and underinsured patients as an expansion waiver population under Florida's demonstration project and to make matching federal payments for their care through the LIP. It is also uncontested that uninsured and underinsured patients actually received inpatient hospital services, and that Plaintiffs determined on a case-by-case basis whether that care was entitled to funding under the LIP.

We begin with the Expenditure Authority for Florida's Medicaid Reform Section 1115 Demonstration (Expenditure Authority), by which the Secretary explicitly exercised his authorities under 42 U.S.C. § 1315(a)(2) to waive expenditure restrictions so that CMS could match "not otherwise matchable" "[e]xpenditures made by Florida for costs related to providing health care services to uninsured and or underinsured." Expenditure Authority at AR440. This purpose was made manifest in the Special Terms and Conditions, which established the LIP "to ensure continued government support for the provision of health care services to Medicaid, underinsured and uninsured populations." STC ¶ 91 at AR421. Further, the Special Terms and Conditions approved a distinct eligibility group for LIP patients. *See* STC ¶ 108(b) at AR426 ("The Florida Medicaid Reform eligibility groups (MEGs) . . . include . . . MEG 3: Low Income Pool."); *id.* ¶ 109(b) at AR430 ("The term 'Demonstration eligibles'. . . refers to the following categories of enrollees [including] . . . MEG 3: Low Income Pool."); *cf. Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 179 ("The eligibility criteria for the individual State section 1115 populations are federally approved and set forth in the terms and conditions of the section 1115 waiver project.").

CMS also plainly acknowledged that the LIP would fund "[h]ealth care expenditures" that could include "uncompensated costs of medical services for the uninsured":

> Funds from the LIP may be used for health care expenditures that would be within the definition of medical assistance [in] section 1905(a) of the Social Security Act. Health care expenditures may be incurred by the State, hospitals, clinics, or by other providers *for uncompensated costs of medical services* for the uninsured.

LIP Expenditure Authorization Letter (June 30, 2006) at AR435 (emphasis added); *see also* STC ¶ 94 at AR422 (same). Consistent in purpose to the Expenditure Authority, under the Special Terms and Conditions CMS agreed to "provide [federal financial payments] . . . for . . . [n]et expenditures associated with the Low Income Pool." STC ¶ 111 at AR429; *see also* LIP

Expenditure Authorization Letter at AR435 ("The availability of Federal matching funds for the LIP is contingent upon the State meeting all LIP Milestones."). These were not misstatements: Other than these documents, CMS confirmed that LIP costs were eligible for matching payments in a subsequent regulatory statement. *See* 72 Fed. Reg. 29,748, 29,814 (May 29, 2007) ("For Florida, while we are still working with the State to define expenditures that can be made through the Low Income Pool, approved expenditures will be eligible for Medicaid matching consistent with the authority under section 1115(a)(2)."); *cf. id* ("Under the [California] demonstration, the uninsured costs are considered eligible under Medicaid . . . .").

Milestone Reports submitted pursuant to the negotiated Reimbursement and Funding Methodology show that Florida hospitals actually used LIP resources to provide inpatient services to uninsured and underinsured patients. *See, e.g.*, Low Income Pool Milestone Reporting Requirements at AR1083; *see also* University of Florida Study at AR1841 ("Hospitals receiving LIP payments served approximately 3.6-3.8 million Medicaid, uninsured, and underinsured individuals in the first three years of Medicaid Reform, in comparison to approximately 2.0 million in the year prior."); University of Florida Study at AR1856 (estimating hospitals reimbursed by the LIP increased uninsured and underinsured inpatient days by approximately 500,000 yearly). Although the Milestone Reports are summaries, "the patient specific claims underlying [the reporting documents] must be maintained by the provider and must be furnished to the State upon request." Florida Memorandum on Medicaid Waiver Patient Days at AR473. Hospitals were thus required to "evaluate, essentially, account by account, encounter by encounter, and eligibility determination by eligibility determination, whether the individuals that make up these statistics" received inpatient hospital services, were uninsured or underinsured, and were eligible for reimbursement for inpatient hospital care from the LIP.

Transcript of PRRB Hearing at AR208 (Scott Davis); *see also id.* at AR268 (Michele Golden) ("[U]pon request those records could be identified for the individual that received services, . . . their health records, what services were received, to demonstrate that that low-income pool funding was being used for the purposes of those services for those individuals."). In short, Plaintiffs had an auditable "paper trail" (probably maintained electronically) for each patient day attributed to a patient whose inpatient hospital care was reimbursed by the LIP under Florida's demonstration project. *See* Transcript of PRRB Hearing at AR268 (Michele Golden).

In sum, it is obvious to the Court that uninsured and underinsured patients received inpatient hospital services through the LIP—which was authorized by the demonstration project and received matching federal funds—and their patient days should have been included in the Medicaid fraction of the Medicare DSH calculation.

### B. The Government's Arguments Are Unpersuasive and Post-Hoc Lawyering

Given the record summarized above, the government's position appears to be that, despite the broad authority granted to the Secretary under § 1115 to explore "new or different approaches to the efficient and cost-effective delivery of health services" and to help states "adapt their programs to the special needs of particular areas or groups of recipients," 42 C.F.R. § 430.25, the Secretary cannot make expansion waiver populations eligible for inpatient hospital services under a demonstration project by reimbursing hospitals for such uncompensated care. The government offers a smorgasbord of arguments which meander back and forth between the statute and the regulation. Only some of its arguments support the reasons expressed by the Board. None is convincing.

1. *The statutory text does not require uninsured and underinsured patients to enroll in a health insurance plan*

Not once does the government address or attempt to distinguish *HealthAlliance*.[9] Instead, it starts its argument by insisting that the *statutory* text—not the text of the regulation—drives the outcome here.

Plaintiffs readily concede that LIP patients are not eligible for medical assistance under a traditional State plan, Pls.' Reply at 15, but note that "the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI." 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). The government argues that this provision cannot save Plaintiffs because the Secretary has interpreted the phrase "not so eligible but who are regarded as such because they receive benefits under a demonstration project" to mean that "a *specific patient* is to receive a *specific benefit package* under the demonstration project." Opp'n at 21 (emphasis added).[10]

When "a statute is silent or ambiguous with respect to a specific issue" within an agency's expertise, courts generally give considerable deference to that agency's reasonable interpretation. *See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Agencies are generally free to establish their interpretations through either rulemaking or case-by-case adjudication, *see United States v. Mead Corp.*, 533 U.S. 218, 243-44 (2001) (Scalia, J. dissenting), and precedent instructs that an agency's interpretation warrants no less

---

[9] The *HealthAlliance* decision was issued before the government filed its Opposition and was mentioned several times in Plaintiffs' Reply brief.

[10] The government cites C.F.R. § 412.106(b)(4)(i) to support its interpretation, but the phrases "specific patient" and "specific benefit package" are nowhere to be found in the regulation or the statute.

deference if made on a case-by-case basis instead of through notice and comment.  *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987).  *But cf. Azar v. Allina*, 139 S. Ct. 1804, 1811-14 (2019) (leaving open whether notice-and-comment requirements apply to all Medicare statutory interpretations).  The government asks for *Chevron* deference here.[11]

        The government's proposed interpretation would informally add new and limiting phrases to a statute that is already clear when unadorned.  *See Forrest Gen. Hosp.*, 2019 WL 2417409, at *5-6 ("[T]he statute means that patients who aren't actually Medicaid-eligible still count towards the Medicaid fraction's numerator if they're considered or accounted to be capable of receiving a demonstration project's helpful or useful effects by reason of a demonstration project's authority.  There's only one plausible way to read this."); *cf. Benefit*, Black's Law Dictionary (11th ed. 2019) (defining "benefit" as the "the helpful or useful effect something has").  But even if the law were ambiguous, the government is not entitled to deference because it points to no agency source for its interpretation.  That is, it is apparent from the Board's decision on Plaintiffs' appeal that the Board was interpreting only the regulation without regard to the statute.  *See* Board Decision at AR25 (discussing the effects of the 2000 Interim Final Rule); *id* ("Second, federal DSH regulation specifies . . . ."); *id* at AR27 ("Finally, the most recent amendment to the DSH regulation in 2003 clarified . . . ."); *see generally id.* at AR24-27 (including no citations to the Medicare statute).  Indeed, there was no need for the

---

[11] The government argues that its interpretation is also compelled by policy:  The Medicaid fraction is a proxy for the number of low-income patients served by a hospital which will be distorted by allowing hospitals in different states to count different patients.  But even if this post-hoc rationale is correct, such distortion would have long been inherent to *any* expansion waiver population included in the DSH calculation, and the government does not explain why the expansion waiver population here should be treated differently from any other similarly approved by the Secretary.

Board to interpret the statute instead of the regulation because the question before the Board was whether the fiscal intermediary had properly interpreted the already-existing regulation that guides its work.[12]

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50. Post hoc rationalizations will not suffice. *Id.* at 49-50; *see also Inv. Co. Inst. v. Camp*, 401 U.S. 617, 628 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands."). Because the Board did not rely on a new interpretation of the statute in its decision, the government may not attempt to do so now.

2. *The regulatory text does not require uninsured and underinsured patients to enroll in a health insurance plan*

The Board was concerned that the Florida "waiver does not adequately describe the exact nature of what is being paid for and whether it would be an 'approved expenditure under Title XIX.'" Board Decision at AR25. The Board thought this ambiguity could have been resolved if uninsured and underinsured patients were "eligible to enroll" in some program on an individuated basis, as in two other decisions where the Board *had* included expansion waiver population days (although each was reversed by the CMS Administrator). Board Decision at AR26 (citing *Sw. Consulting*, 2017 WL 909303; *UCP Days Grp.*, 2016 WL 6299482).

---

[12] Although Congress separately added language to the Medicare statute, *see* DRA § 5002(a), and ratified the existing regulation, *see* DRA § 5002(b), the Board appears to understand both parts together as merely ratifying the existing regulation. *See, e.g.*, *UCP Days Grp.*, 2016 WL 6299482, at *4 (stating 42 C.F.R. § 412.106(b)(4) was "'ratified' . . . when Congress amended the federal DSH statute" at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).

Reversed twice by the CMS Administrator, perhaps the Board offered the best analysis it could consistent with the Administrator's previous decisions. But the Board's interpretation has no basis in the regulatory text. As the court in *HealthAlliance* made clear, and the government concedes here, the government "cannot[] explain why the express terms of the demonstration project waiver agreement *matter* in the context of a regulation that is simply and solely concerned with the fiscal intermediary's proper calculation of a hospital's DSH adjustment." *HealthAlliance*, 346 F. Supp. 3d at 58 (emphasis in original); *see also Forrest Gen. Hosp.*, 2019 WL 2417409, at *8 ("What does *not* matter for purposes of this regulation is what the plan documents say about eligibility for particular services."). The regulation tasks the fiscal intermediary only with determining whether a patient was eligible for inpatient hospital services under a demonstration project on a given day; neither the words nor the concepts of "enroll" or "eligible to enroll" appear anywhere in the DSH adjustment statute or the regulation. *Cf.* 42 U.S.C. § 1395ww(d)(12) (describing individuals in a different adjustment program as "enrolled for[] benefits under [Medicare]"). Thus, both federal courts which have since ruled on *Southwest Consulting* and *UCP Days Group*,[13] in *HealthAlliance* and *Forrest General Hospital*, respectively, included expansion waiver patient days in the DSH calculation based on the care expansion waiver patients *actually* received, not on the text of the waiver or on the structure of the hospitals' reimbursement claims. *See Forrest Gen. Hosp.*, 2019 WL 2417409, at *10.

---

[13] The Board states that it was significant in *UCP Days Group* that "the State of Louisiana made expedited determinations of eligibility for specific individuals and . . . hospitals made claims specific to these individuals." Board Decision at AR26 (citing *UCP Days Grp.*, 2016 WL 6299482). The Court finds no mention of expedited determinations or specific hospital claims in the cited decision. That said, the Court notes that the Board in *UCP Days Group* "distinguish[ed] between patient days 'sanctioned' as part of an § 1115 waiver and those 'state only' days, such as general assistance or charity care days, for which Medicare hospitals have long argued should be included in the Medicare DSH calculation," and found that the former "should be included in the Medicare DSH calculation." *Id.* at *6.

As applied here, the government does not contest that uninsured and underinsured patients received inpatient hospital services funded by the LIP. Regardless of whatever else the LIP may have paid for, this is enough to satisfy the regulation.

### 3. *Benefits similar to those available to traditional Medicaid beneficiaries means inpatient hospital services*

The 2003 Clarifying Rule states that the Secretary intended to include in the DSH calculation only "patient days of demonstration populations who receive benefits under the demonstration project that are similar to traditional Medicaid beneficiaries, including inpatient benefits." 68 Fed. Reg. at 45,420. The government contends that the Secretary thereby "made clear that the phrase 'inpatient hospital services' refers to a specific benefit of eligibility that is cued to the '*benefit package*' available to a Medicaid beneficiary." Def.'s Reply at 10. Similarly, the Board stated that "it cannot determine whether the benefit to the patient was similar to those available to traditional Medicaid beneficiaries, limited or otherwise" because Florida's waiver does not specify the benefits to be received. Board Decision at AR27.

The government reads more into these words than they will support. "Inpatient hospital services" cannot also imply a broader "benefit package," since inpatient services are already an enumerated subset of the benefits Medicaid provides. 42 U.S.C. § 1396d(a)(1). Nor can "eligible" support the government's argument, since it does not imply any specific mechanism for providing inpatient hospital services. Indeed, such an implication would be so context specific that it could not possibly comport with the plain meaning of the word. *Cf. Sw. Consulting*, 2017 WL 909303, at *7 (Nix and Benson, Bd. Members, concurring) ("[T]he preamble discussion [to § 412.106(b)(4)] only states in generic terms that inpatient benefits must be 'received' under the § 1115 waiver.").

Contrary to these contortions, the regulation is clear on its face: for their patient days to be included in the DSH calculation, Medicaid-ineligible patients must be "eligible for inpatient hospital services under . . . a waiver authorized under section 1115(a)(2)." 42 C.F.R. § 412.106(b)(4)(i). That is to say, Medicaid-ineligible patients in demonstration projects receive "similarly comprehensive" benefits to Medicaid-eligible patients when they receive inpatient hospital services. *See Forrest Gen. Hosp.*, 2019 WL 2417409, at *8; *HealthAlliance*, 346 F. Supp. 3d at 56 (finding "roughly equivalent" benefits are "evidenced by the provision of 'inpatient hospital services'"); *see also* 68 Fed. Reg. 45,421 (including expansion waiver population patient days is appropriate "only to the extent that those individuals receive inpatient benefits under the section 1115 demonstration project"); *cf.* Transcript of PRRB Hearing at AR266 (Michele Golden) ("[T]he design of the low-income pool was to provide the same services that would have been provided if the member . . . was . . . a typical Medicaid eligible."). Further, it makes sense that the 2003 Clarifying Rule ultimately identified inpatient hospital services as the critical Medicaid service; unlike the government's vague allusions to a specific benefit package, eligibility for inpatient hospital services is a clear, definite standard by which to determine whether a patient receives benefits similar to those available to traditional Medicaid beneficiaries. The government's position leaves unclear by what yardstick "similar benefits" would be measured.

### 4. The statutory definition of medical assistance is irrelevant

The government devotes lengthy pages to arguing that the definition of "medical assistance" is limited and patients under Florida's demonstration project whose inpatient hospital services are reimbursed by the LIP do not qualify. To start, it is unclear that the government's premise is correct. The record demonstrates that, in the context of demonstration projects, neither Congress, CMS, nor the Judiciary has limited the use of the term "medical assistance" to

individuals already eligible for Medicaid. *See, e.g.*, Deficit Reduction Act § 6201(a)(1)(B) (authorizing funding, "with respect to evacuees who do not have coverage for such assistance through insurance . . . under [Medicaid], . . . for those evacuees receiving medical assistance under the [demonstration] project for the total uncompensated care costs incurred"); LIP Expenditure Authorization Letter at AR435 ("[H]ealth care expenditures that would be within the definition of medical assistance . . . may be incurred by . . . hospitals . . . for uncompensated costs of medical services for the uninsured."); STC ¶ 94 at AR422 (same); *Forrest Gen. Hosp.*, 2019 WL 2417409, at *11 (finding uninsured patients received "medical assistance" through an uncompensated care pool); *Adventist Health Sys./Sunbelt, Inc. v. Sebelius*, 715 F.3d 157, 159 (6th Cir. 2013) (finding the Secretary may "waive, among other things, statutory eligibility limitations on the payment of 'medical assistance' to individuals under the Medicaid program").[14]

But all of this is ultimately beside the point because the government's argument patently ignores critical language of the Medicare statute. The Secretary may count in the DSH calculation patient days for patients who were "eligible for medical assistance" and for "patients not so eligible *but regarded as such* because they receive benefits under a demonstration project approved under subchapter XI." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); *cf. Regard*, Oxford English Dictionary, https://www.oed.com/view/Entry/161187 ("To consider, look on, view, as being something specified."). There is no doubt that uninsured and underinsured patients in Florida received benefits under a demonstration project and that even if not strictly eligible for

---

[14] The government relies heavily on the D.C. Circuit's decision in *Adena* to anchor the definition of "medical assistance," but as with the government's other cited cases, *Adena* addressed only whether patients who received uncompensated care reimbursed by *Medicaid* DSH supplemental funding received "medical assistance under a State plan approved under [Medicaid]." *Adena*, 527 F.3d at 178. All references to "medical assistance" were limited to that context.

"medical assistance," as the government contends, these uninsured and underinsured patients in Florida were "regarded as such." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The government cannot explain why the definition of medical assistance matters here; all of the cases upon which the government relies that discuss "medical assistance" and the DSH calculation concern only the first half of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), which addresses patients eligible for traditional Medicaid, and not the second, which addresses Medicare-*ineligible* patients who are "regarded as" eligible for medical assistance under a demonstration project for purposes of inclusion in the DSH calculation. *See also* 42 U.S.C. § 1315(a)(2) (stating demonstration project costs "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan").

        5.   *The regulation does not differentiate between payments to hospitals and patients*

In its decision on Plaintiffs' appeal, the Board stated that the Medicare DSH calculation is "intended to limit the inclusion of patient days in the DSH calculation to *individuals* who become eligible under the terms of the waiver" and not "payments made to a hospital to compensate it for services provided to an unspecified population." Board Decision at AR25 (emphasis in original); *see also id* ("Florida's Low-Income Pool provides a gross payment to hospitals . . . for services provided to uninsured and underinsured individuals as an undifferentiated group, not identified or qualified individually for waiver services."). Thus, according to the Board, because the LIP "provides a gross payment to hospitals . . . to reimburse them for services provided to uninsured and underinsured individuals," it is inconsistent with the regulation. In a similar vein, the Board expressed concern that LIP patients are "not required to apply for the hospital's charity care program, do not apply or receive a Medicare card, a certificate of coverage, have a right of reconsideration on appeal and do not receive a bill or

notification when a claim is paid." Board Decision at AR27. In this way, the Board concluded "that it is not the individual patients whose eligibility is established and benefits paid on their behalf," as required by the regulation which "focuses on individuals." *Id.*

The distinction the Board makes between LIP reimbursements for individuals and reimbursements for groups of individuals is nowhere to be found in the plain text of the regulation. The Board is correct that § 412.106(b)(4) does not mention gross payments made to hospitals for services rendered to a group of persons. But nor does it mention or require specific payments to hospitals for services rendered to individual patients. In fact, it does not mention payments at all. Section 412.106(b)(4) only directs the fiscal intermediary to count patient days for patients who were eligible for inpatient hospital services, and the fiscal intermediary is directed to include qualifying patient days in the DSH calculation "*regardless* of whether particular items or services were covered or paid under the State plan or the authorized waiver." 42 C.F.R. § 412.106(b)(4)(i) (emphasis added).

This is not to say that the hospitals may provide inpatient hospital services to just anyone and include those patient days in their DSH calculations. To the Board's point, under 42 C.F.R. § 412.106(b)(4)(iii), hospitals must make individual patient eligibility determinations and further be able to justify those determinations to CMS. *See* 42 C.F.R. § 412.106(b)(4)(iii). But it is important that the requirements of subsection (iii) are separate from subsections (i) and (ii); what day the hospital finds convenient to make eligibility determinations—before or after services are provided—does not itself figure into whether or when patients are eligible for inpatient hospital services. Further, the record is clear that hospitals did make individuated patient eligibility determinations, and that documents related to those patient-specific determinations were available for audit by CMS, and in fact had been audited. *See* Medicaid

31

Reform in Florida: Key Events and Activities in 2008 at AR1712. The Board's reliance on cards, certificates, and rights of appeal as indicia of eligibility has no basis in the regulation.

### 6. The charity care cases are inapplicable

The government argues that several cases have already held that uninsured and underinsured patients receiving charity care, *i.e.*, uncompensated care, are not "eligible for Medicaid" and may not be included in the DSH calculation. Opp'n at 32 (citing *Adena*, 527 F.3d at 179; *Owensboro Health, Inc. v. U.S. Dep't of Health & Human Servs.*, 832 F.3d 615, 623 (6th Cir. 2016); *Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81, 86-87 (D.D.C. 2010)). As the government puts it, "this case is *identical* to the charity care cases . . . except for the fact that the uncompensated care subsidy is authorized under a Section 1115 demonstration project rather than the Medicaid state plan." Def.'s Reply at 11 (emphasis in original); *see also* Opp'n at 11 n.6 ("Functionally, the Florida LIP fund is equivalent to an additional pool of money available for [State-plan uncompensated care] payments made to hospitals.").[15]

The Court agrees that "patients who obtain charity care" are not "eligible for medical assistance under a State plan approved under [Medicaid]" and cannot be included in the DSH calculation. *See Adena*, 527 F.3d at 179. But the government's description of the case law provides the critical distinction: section 412.106(b)(4)(i) instructs that patients are "*deemed* eligible for Medicaid" if they are "eligible for inpatient hospital services under an approved State Medicaid plan *or* a waiver authorized under section 1115(a)(2)." 42 C.F.R. § 412.106(b)(4)(i)

---

[15] States also receive capped federal allotments under traditional Medicaid, which they can use to reimburse hospitals for uncompensated care to low-income patients as part of their own *Medicaid* DSH adjustment. *See* 42 U.S.C. § 1396r-4. Unlike the LIP, a state's uncompensated care and Medicaid DSH programs are approved as part of a traditional State plan approved under Title XIX. *See Adena*, 527 F.3d at 179. Interestingly, during the relevant time periods, Florida received both LIP funding and a Medicaid DSH allotment. *See* Report of the Low Income Pool (LIP) Cost Limit Work Group (Feb. 20, 2006) at AR568.

(emphasis added). In each of the cases cited by the government, the health care providers argued that their patients were eligible for inpatient hospital services *under an approved State Medicaid plan*, not under a demonstration project. *See, e.g.*, *Adena*, 527 F.3d at 178 ("It is clear . . . that under Ohio law HCAP patients do not receive care pursuant to the Medicaid plan."); *Owensboro Health*, 832 F.3d at 620 ("KHCP patient days can be rationally distinguished from § 1115 patient days based on the fact that statutes treat the two groups differently and on the fact that the federal government has control over § 1115 projects but not over KHCP."); *Ne. Hosp. Corp.*, 699 F. Supp. at 90 ("[T]he treatment these charity care patients receive is not provided 'under a State [Medicaid] plan.'" (internal quotes omitted)). So, the only question before those courts was whether uncompensated care fell within the ambit of a State plan approved under Medicaid; plainly it did not. However, those courts did not address how uncompensated care should be treated when authorized and funded by a demonstration project. *Cf. Verdant Health Comm'n v. Hargan*, 708 Fed. App'x 459, 460 (9th Cir. 2018) (finding patients who receive uncompensated care through traditional State plans are "legally distinct from § 1115 expansion populations, even if they share certain characteristics"); *Forrest Gen. Hosp.*, 2019 WL 2417409, at *11 (including uncompensated care patient days authorized by a demonstration project in the DSH calculation). The government admits the distinction and then, by sleight of hand, ignores it. The attempt to persuade fails.

> 7. *The Secretary has already exercised his discretion to include LIP patients in the DSH calculation*

Finally, the government suggests that the Secretary merely exercised his inherent authority to exclude LIP patient days from the DSH calculation, a point not relied upon by the Board and seemingly invented for this litigation. The Secretary may have such discretion if reasonably exercised and explained. *See Cookeville*, 531 F.3d at 848 ("Plausibly, the 'to the

extent' language is a grant of discretion to the Secretary to determine which costs or how much of the costs are to be treated as expenditures.").  But such discretion must be exercised "prospectively," *see id.* at 848, not after a demonstration project has already been fully approved and implemented and the bill comes due.  *See Forrest Gen. Hosp.*, 2019 WL 2417409, at *10 ("Once the Secretary authorizes a demonstration project, no take-backs.").

On this record, the government cannot reasonably argue that the Secretary has exercised such discretion vis-à-vis the Florida demonstration project.  While the Secretary had multiple opportunities to disapprove Florida's demonstration project, to disapprove the LIP, to negotiate different provisions and definitions in the Special Terms and Conditions, and to disapprove the Reimbursement and Funding Methodology guiding implementation of the LIP, he did none of those things.  Instead, notwithstanding any administrative complications highlighted by the Board, at each of those stages the Secretary made obvious that he intended to provide medical care to Florida's underinsured and uninsured patients—however poorly that group might be defined—by reimbursing hospitals for uncompensated care with matching Medicaid funds through a demonstration project.  *See* Letter from HHS Secretary Michael O. Leavitt to Governor Jeb Bush Approving Florida's Section 1115 Waiver (Oct. 19, 2005) at AR899 ("My Department looks forward to working with your staff as Florida implements . . . a Low Income Pool to provide services to uninsured individuals.").  The Secretary's § 1115 waiver included no caveats as to the Medicare DSH adjustment, even though the demonstration project had natural consequences for such hospital funding.  The government's briefs argue to the contrary without explanation of or regard to the record evidence.

## IV. CONCLUSION

Plaintiffs' Motion for Summary Judgment, Dkt. 18, will be granted and Defendant's Cross-Motion for Summary Judgment, Dkt. 19, will be denied.  The Court will vacate the Board's decision and will remand this case for further proceedings consistent with this Opinion.  A memorializing Order accompanies this Opinion.


Date:  July 23, 2019

_____
ROSEMARY M. COLLYER
United States District Judge